**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

**MARK ORLANDO,**

                                 **Plaintiff,**

  vs.                                                        **9:19-CV-1183
                                                                                              (MAD/CFH)**

**DR. VANDA JOHNSON, et al.,**

                                 **Defendants.**
_____

**APPEARANCES:**                                 **OF COUNSEL:**

**FRANZBLAU, DRATCH LAW FIRM**        **BRIAN M. DRATCH, ESQ.**
233 Broadway, Suite 2701
New York, New York 10271
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK STATE**        **DAVID C. WHITE, AAG**
**ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

    Plaintiff Mark Orlando[1] commenced this civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983") against several New York State Department of Corrections and Community Supervision ("DOCCS") doctors and nurses for their alleged deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. *See* Dkt. No. 1. On July 8, 2020, Defendants filed a motion to dismiss Plaintiff's first amended complaint

---

[1] Although he commenced this action *pro se*, Plaintiff is currently represented by counsel. *See* Dkt. No. 47.

as barred by the three-year statute of limitations period for Section 1983 actions. *See* Dkt. No. 22. On October 5, 2020, Magistrate Judge Hummel issued a Report-Recommendation and Order recommending that Defendants' motion to dismiss be granted and the amended complaint be dismissed without prejudice and with leave to replead. *See* Dkt. No. 27. This Court adopted the October 5, 2020 Report-Recommendation and Order in its entirety on December 17, 2020. *See* Dkt. No. 28. Plaintiff submitted a proposed second amended complaint on August 5, 2021. *See* Dkt. No. 42.

On September 17, 2021, Magistrate Judge Hummel reviewed the proposed second amended complaint and ordered that it would be held in abeyance until the conclusion of an evidentiary hearing on the issue of whether Plaintiff's medical condition between July 27, 2016 and September 18, 2016 prevented him from commencing this action. *See* Dkt. No. 44. A proposed third amended complaint was substituted for the proposed second amended complaint on October 5, 2021. *See* Dkt. No. 49. The evidentiary hearing was held before the Court on February 11, 2022. *See* Dkt. No. 64. For the reasons that follow, Plaintiff's proposed third amended complaint is dismissed.

**II. BACKGROUND**

At all relevant times, Plaintiff was being held in DOCCS custody at Clinton Correctional Facility. Defendants Dr. Vanda Johnson, Dr. Richard Adams, and Nurse Practitioner Catherine Bushey-Calley were all medical personnel employed by DOCCS. Plaintiff alleges that "each of the Defendants knowingly prescribed Plaintiff a mixture of non-steroidal anti-inflammatory drugs ('NSAIDs') ... despite the fact that they knew or should have known that [Plaintiff] previously had gastric bypass surgery." Dkt. No. 49 at ¶¶ 5-6. Plaintiff further alleges that, as a result of the improper use of NSAIDs, he was admitted to Albany Medical Center ("AMC") on July 27, 2016

for emergency surgery and treated for, among other things, a perforated ulcer, perforated bowel, hemorrhagic pancreatitis, liver failure, kidney failure, and sepsis. *See id.* at ¶ 8. Plaintiff claims that from that date until September 18, 2016, he "was placed on a ventilator and unable to make any medical decisions for himself and was otherwise incapacitated as a result." *See id.* at ¶ 9. After September 18, 2016, Plaintiff claims he was "generally isolated and unable to communicate with anyone except hospital staff and visitors until October 19, 2016, when he was placed in isolation for approximately 180 days due to having contracted a contagious upper respiratory infection." *See id.* at ¶ 10. Plaintiff was thereafter held in the Coxsackie Correctional Facility Regional Medical Unit until June 19, 2019. *See* Dkt. No. 79 at 11-12. This action was commenced on September 12, 2019.

As relevant here, Magistrate Judge Hummel's October 5, 2020 Report-Recommendation and Order concluded that Plaintiff's claims accrued no later than July 27, 2016, the date that he was hospitalized for complications associated with having taken NSAIDs. *See* Dkt. No. 27 at 8. Accordingly, the three-year statute of limitations for Plaintiff's Eighth Amendment claims expired on July 17, 2019, thirty-seven days before Plaintiff commenced this action. Magistrate Judge Hummel then determined, in the subsequent September 17, 2021 Memorandum-Decision and Order, that "the Court [could not], as a matter of law, conclude at this juncture that either equitable or statutory tolling [was] warranted," and an evidentiary hearing was necessary to allow the "parties to present evidence concerning [P]laintiff's cognitive abilities" while he was in the ICU (*i.e.*, between July 27, 2016 and September 18, 2016). *Id.* at 10.

At the resulting hearing, Plaintiff testified that he "had no memory whatsoever" of the period when he was in the ICU, and was completely unable to speak on his cognitive ability, lucidity, or ability to speak or move during that time. *See* Dkt. No. 79 at 18. Plaintiff asserted

3

that he "became more lucid, and ... understood what was going on" *after* he was removed from the ICU on September 18, 2016 and was taken off certain medications.[2]  *Id.*  Plaintiff also stated that he first became able to speak on September 19, 2016, when a Passy Muir Speaking Valve was inserted into his tracheostomy.  *Id.* at 13.  At that time, Plaintiff could also physically write, but was not allowed to have pens or paper.  *Id.* at 12.

      Defendants then cross examined Plaintiff with a number of the medical records generated while he was in the ICU between July 27, 2016 and September 18, 2016.  These records, on the whole, contained notations from medical personnel that indicated that Plaintiff was aware, able to communicate nonverbally, and able to understand and agree to the details of his plan of care.  *See* AMC Medical Records ("AMC MR") at 2226 (noting, on July 29, 2016, that Plaintiff was "aware of plan of care, makes known via writing on clipboard"); *id.* at 2225 (noting, on July 30, 2016, that Plaintiff was "aware and involved in the plan of care"); *id.* at 2222 (noting, on August 3, 2016, that Plaintiff was "[a]lert and oriented, aware of current plan of care"); *id.* at 2229 (noting, on August 17, 2016, that Plaintiff was "alert, mouthing words and attempting to write"); *id.* at 658 (noting, on August 19, 2016, that a "discussion" was had with Plaintiff about the plan of care); *id.* at 2247 (noting, on August 21, 2016, that Plantiff "communicates by nodding head in agreement when asked"); *id.* at 584-85 (noting, on August 27, 2016, that physical and occupational therapy plans and goals were reviewed with Plaintiff, "[w]ho [a]grees"); *id.* at 2239 (noting, on August 27, 2016, that Plaintiff was "able to nod head and make hand gestures appropriately" and "[a]ble to make needs known"); *id.* at 2252 (noting, on September 8, 2016, that Plaintiff was "educated on plan of care and treat[ment] goals" and was "[i]n agree[m]ent with plan of care"); *id.* at 1756

---

[2] Plaintiff testified that he was being given Fentanyl, Dilaudid, Oxycodone, and Tylenol while in the ICU.  *See* Dkt. No. 79 at 13.

(noting, on September 12, 2016, that Plaintiff "mouths words appropriately," "[o]beys commands," and demonstrated an "[a]ppropriate/[n]ormal" verbal response when being assessed under the Glasgow Coma Scale); *id.* at 579 (noting, on September 15, 2016, that Plaintiff was "nodding head yes and no in response to questions," "agreeable" to physical therapy, and "indicated walking" when asked what his physical therapy goal was).

Plaintiff's sister, Ms. Goodman, testified that she was Plaintiff's healthcare proxy and first arrived at AMC on August 1, 2016. *See* Dkt. No. 79 at 37, 39. Ms. Goodman stated that, during her first visit, she learned that Plaintiff had been put on a ventilator and that AMC staff "didn't think [Plaintiff] was going to make it." *Id.* at 40. Ms. Goodman subsequently made in-person visits "six or seven" times. *Id.* at 41. Ms. Goodman observed that Plaintiff "was not speaking" and could not write, but she was communicating with Plaintiff through "yes-and-no questions." *Id.* at 62. As Plaintiff's healthcare proxy, Ms. Goodman also spoke to AMC staff over the phone about Plaintiff's condition, and took contemporaneous notes of these conversations. *Id.* at 44. In those notes, Ms. Goodman records several instances where AMC staff reported communicating with Plaintiff. *See* Pl's Exh. 1 at 3 (noting, prior to August 8, 2016, that Plaintiff was "following commands" and "nodding!"); *id.* at 9 (noting, on August 15, 2016, that Plaintiff was trying to communicate with medical staff by "mouthing words"); *id.* at 11 (noting, on August 15, 2016, that a nurse is "learning to read [Plaintiff's] lips" and Plaintiff said "thank you" and "yes to pillow"); *id.* at 32 (noting on August 31, 2016, that Plaintiff was "asking appropriate questions").

Dr. Samuels, the physician who performed Plaintiff's first surgery on July 27, 2016, testified that there were a "few different times" when she believed he "would not make it out of the hospital." Dkt. No. 80 at 10. Dr. Samuels also noted that Plaintiff was unable to speak while he was in the ICU due to his breathing tube. *See id.* at 8. On cross, Dr. Samuels noted that she

was not involved with Plaintiff's rehabilitation care, but that "you could talk to [Plaintiff] and he could nod or answer or shake his head ... after he left the ICU." *Id.* at 14-15. Dr. Samuels did not testify about Plaintiff's ability to communicate nonverbally while in the ICU.

Defendants called five AMC employees—two nurses, one occupational therapist, and two physical therapists—who treated Plaintiff between July 27, 2016 and September 18, 2016. Although none of these witnesses had an independent recollection of Plaintiff while he was in the ICU, they were able to testify about the medical records they had created and the notes therein. Stated broadly, these witnesses affirmed that their notes indicated that Plaintiff was able to understand basic care questions and his physical/occupational care plans, and communicated his understanding through nodding his head and other similar methods. *See* Dkt. No. 79 at 68, 74-75, 83-84, 91-92, 99-100.

### III. DISCUSSION

"[E]quitable tolling is only appropriate 'in rare and exceptional circumstances,' in which a party is 'prevented in some extraordinary way from exercising his rights.'" *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (quotations and brackets omitted). To warrant equitable tolling, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Fla.*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008). "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). "[M]edical conditions, whether physical or psychiatric, can manifest extraordinary circumstances, depending on the facts presented." *Id.*

However, a plaintiff must do more than "'allege the existence of physical or mental ailments'"; they must also "'show[ ] that these health problems rendered [them] unable to pursue [their] legal rights during the [relevant] time period.'" *Olivio v. United States*, No. 20-CV-231, 2022 WL 409720, *3 (E.D.N.Y. Feb. 10, 2022) (quoting *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 173 (S.D.N.Y. 2000)); *see also Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000) ("The word 'prevent' requires the [litigant] to demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the [litigant], acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances"). "With respect to a medical condition, this requires the litigant to 'offer a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights.'" *Rivera v. Mucha*, No. 3:21-CV-316, 2022 WL 1205203, *3 (D. Conn. Apr. 22, 2022) (quoting *Bolarinwa v. Williams*, 593 F.3d 226, 232 (2d Cir. 2010)). In judging whether a petitioner has satisfied the requirements for equitable tolling, a court must exercise its "'equity powers ... on a case-by-case basis,'" *Holland*, 560 U.S. at 649-50 (quotation omitted); *accord Dillon v. Conway*, 642 F.3d 358, 362 (2d Cir. 2011). It is the plaintiff who "carries the burden of proving that equitable tolling is justified." *Rios v. Mazzuca*, 78 Fed. Appx. 742, 743 (2d Cir. 2003) (citation omitted).

Plaintiff is not entitled to equitable tolling under these facts. First, Plaintiff has failed to show that his medical condition rises to the level of extraordinary circumstances. The medical records generated between July 27, 2016 and September 18, 2016 repeatedly state that Plaintiff was aware, able to communicate nonverbally, and understood and agreed to the details of his plan of care. *See* AMC MR at 579, 584-585, 658, 1756, 2222, 2225-26, 2229, 2239, 2247, 2252. The

testimony of five AMC employees supported these medical records.  *See* Dkt. No. 79 at 68, 74-75, 83-84, 91-92, 99-100.  Additionally, Ms. Goodman testified that she was communicating with Plaintiff through "yes-and-no questions," *id.* at 62, and her written notes detail several times that AMC staff reported successfully communicating with Plaintiff while he was in the ICU.  *See* Pl's Exh. 1 at 3, 9, 11, 32.  Neither Plaintiff nor Dr. Samuels contradicted this evidence during their testimony.  Plaintiff claimed to have no memory of the relevant time period, and Dr. Samuels only addressed Plaintiff's ability to communicate nonverbally during the time *following* his release from the ICU.  Although there is no doubt that Plaintiff was extremely ill—and sometimes close to death—while he was in the ICU, there is no issue of material fact as to Plaintiff's lucidity and ability to communicate nonverbally during that time.

Second, even assuming that Plaintiff had established an extraordinary circumstance between July 27, 2016 and September 18, 2016, Plaintiff has not established that he diligently pursued his rights in the time remaining before the statue of limitations ran.  Specifically, Plaintiff had over two years and ten months (from September 18, 2016 to July 27, 2019) to timely file his complaint after he was released from the ICU.  Plaintiff admits that he was "more lucid" after he left the ICU, Dkt. No. 79 at 10, and, although the law library was closed to physical access, Plaintiff was able to access legal materials through "cell study services," Dkt. No. 75.  Plaintiff asserts that he was "not allowed to have stamps, envelopes, pens, [or] paper" while he was in the Coxsackie Correctional Facility Regional Medical Unit, but provides no information about what efforts he made to diligently pursue his rights during that time period.  Dkt. No. 79 at 12.

Accordingly, the Court holds that Plaintiff is not entitled to the application of equitable

tolling[3] for the period between July 27, 2016, and September 18, 2016.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's proposed third amended complaint (Dkt. No. 49) is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 5, 2022
Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[3] Plaintiff does not argue that he is entitled to statutory tolling under New York's tolling provision, C.P.L.R. § 208. *See* Dkt. No. 83 at 2 (requesting only that the court "invoke the doctrine of equitable tolling"). Even if he had, however, the Court would have declined to apply it in this case for substantially the same reasons as expressed above. *See La Russo v. St. George's U. Sch. of Med.*, 747 F.3d 90, 99 (2d Cir. 2014) ("'Difficulty in functioning is not sufficient to establish insanity for purposes of § 208; rather, the plaintiff must be totally unable to function as a result of a "severe and incapacitating" disability'") (quotation omitted); *Bethune v. Mt. Sinai Beth Israel Med. Ctr.*, 173 F. Supp. 3d 10, 11 (S.D.N.Y. 2016) ("[I]f at any time the plaintiff 'experienced a lucid interval during which she regained her ability to protect her legal rights' tolling is lost and Section 208 does not apply") (quotation omitted).